WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| JERRY MCGUIRE, ) | No. CV-05-02694-PHX-JAT |
| ) | |
| Plaintiff, ) | **ORDER** |
| ) | |
| vs. ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |
| ) | |

Pending before this Court are Plaintiff's ("McGuire") claims against the federal government ("Government"). The parties presented evidence on April 14 and 15, 2005 before a bankruptcy judge who issued proposed findings of fact and conclusions of law. Because this is a non-core proceeding, pursuant to 28 U.S.C. § 157(c)(1) (2005) and Rule 9033 of the Federal Rules of Bankruptcy Procedure, proposed findings of fact and conclusions of law were filed with this Court. Both parties filed objections. Pursuant to 28 U.S.C. § 157(c)(1), this Court will consider the bankruptcy court's conclusions of law and findings of fact and review *de novo* those matters to which the parties timely and specifically objected. This Court finds as follows.

**II. FINDINGS OF FACT**

McGuire and the Government made no objections to the Findings of Fact ("FOF") set forth in Doc. No. 1, Attach. No. 1, ¶¶ 1–9, 11, 13–17,19–20, and 22–26. These FOF are hereby accepted and adopted.

The Government objected to FOF 10, 18, and 21 based not on error in the bankruptcy court's version of the events but on the defendant's disagreement with the bankruptcy court's characterization of the facts.[1] The Government's objections are overruled and these FOF are hereby accepted and adopted.

The Government objected to FOF 12. While its objection concerns the bankruptcy court's characterization of the facts, additional pertinent facts should be added. Allen Anspach, the Superintendent of the Colorado River Agency of the Bureau of Indian Affairs, ("Anspach") did not respond to the phone calls made to him by McGuire in 1999. But, he sent three letters throughout the year urging McGuire to submit documentation and apply for a permit to build a new bridge.[2] FOF 12 is hereby amended and adopted as amended.

The Government objected to FOF 27, regarding the bankruptcy court's recitation of jurisdiction. This Court already settled the jurisdictional issue in *McGuire v. Department of Interior*, CV-03-254-PHX-JAT, Order, July 11, 2003 (Doc. No. 9) so FOF 27 is hereby accepted and adopted.

---

[1] For example, the bankruptcy court characterized Anspach's letter of December 24, 1998 as stating the bridge was unauthorized under 25 C.F.R. 171.9 "because there was no construction specifications submitted to the [Bureau of Indian affairs] for [] approval." Doc. No. 1, Attach. No. 1. The Government argued that the bridge was unauthorized not only because it lacked pre-approval by BIA but also because "no crossing permit has been obtained." Doc. No. 1, Attach. No. 3. Plaintiff agreed that later Anspach testified that "unauthorized" meant the bridge was "'there without a permit from the irrigation project.'" Doc. No. 7. However, the bankruptcy court accurately described the contents of Anspach's letter. *See* Ex. 20. Moreover, FOF 11 already describes the Government's clarification.

[2] The letters are dated February 5, 1999 (Ex. 21), August 25, 1999 (Ex. 22), and November 19, 1999 (Ex. 24).

## II. ISSUES OF LAW

McGuire and the Government made no objections to Legal Issues set forth in Doc. No. 1, Attach. No. 1. These Legal Issues are hereby accepted and adopted.

## III. CONCLUSIONS OF LAW

### A. Conclusion of Law No. I.B.2. Regulatory Taking

The Takings Clause of the Fifth Amendment provides that private property cannot "be taken for the public use, without just compensation." U.S. Const. amend. V. A taking often involves direct seizing or physical invasion of private property. *Lingle v. Chevron U.S.A. Inc.*, --- U.S. ---, ---, 125 S. Ct. 2074, 2080 (2005). However, the government can also appropriate private property through regulation. A regulatory taking occurs when a regulatory action: (1) causes the property owner to suffer permanent physical invasion, (2) deprives the owner of all economically feasible use of the land, or (3) causes the land owner sufficient economic injury, which is determined by a factual inquiry where the court looks at the regulation's economic impact, its interference with distinct investment-backed expectations, and the character of the governmental action. *Id.* at ---, 125 S. Ct. at 2081–82 (citing *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)) (the *Penn Central* test).

In this case, McGuire sued the Government on the theory that when the Bureau of Indian Affairs ("BIA") destroyed a bridge spanning a government easement, such destruction caused McGuire to no longer have access to his property. Importantly, the property at issue in the case is divided into two sections by a canal running east-west across the property. These sections are the Northern Portion and the Southern Portion. A public highway—Mohave Road—runs parallel to and just south of the canal. The bridge spanned the canal providing McGuire access from Mohave Road to the property north of the canal.

Following the hearing, the bankruptcy court found the Government had effected a regulatory taking of some but not all of the economically beneficial use of McGuire's property interest. The bankruptcy court based its conclusion on the bankruptcy court's finding that McGuire still had access to and full use of the Southern Portion of his property.

1 Applying the *Penn Central* test, the bankruptcy court found removal of the bridge imposed 2 severe financial hardship on McGuire since he was forced to stop farming the Northern 3 Portion in which he had made substantial investments. Though the Government had cited 4 safety and liability concerns, the bankruptcy court determined that the Government severed 5 McGuire's access to his property without first pursuing less onerous alternatives.

6 McGuire objected to the bankruptcy court's conclusion by arguing that the 7 Government's action amounts to a wholesale taking of the land because, without the ability 8 to farm the Northern Portion, McGuire was unable to make his lease payment. McGuire 9 further argued that his inability to pay rendered his property interest—the leasehold—of no 10 value.

11 McGuire raised the question of how to determine the "'property interest' against 12 which the loss of value is measured." *See generally Lucas v. S.C. Coastal Council*, 505 U.S. 13 1003, 1016 n.7 (1992); *Palazzolo v. Rhode Island*, 533 U.S. 606, 631 (2001). In other words, 14 if the property interest is the combined value of the Northern and Southern Portions, 15 McGuire suffered only a partial regulatory taking. If the property interest is the value only 16 of the Northern Portion, he suffered a complete abrogation.

17 The Supreme Court settled this denominator question in *Tahoe-Sierra Preservation* 18 *Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 330–31 (2002). The 19 analysis hinges on "whether there was a total taking of the entire parcel." *Id.* at 331. 20 Otherwise, *Penn Central* applies. *Id.* The Court explained that in order to define the property 21 interest, a court must look at both the geographic extent of the interest and time span of 22 ownership. *Id.* Thus, a land owner only sustains a total taking when permanently deprived 23 of the use of the entire area. *Id.* at 332.

24 Here, McGuire only lost access to half of his leasehold so he did not experience a total 25 taking. McGuire did not need to cross the bridge in order to farm the Southern Portion so he 26 was still able to farm it. While the yield of the Southern Portion was insufficient to generate 27 the revenue necessary to make the annual lease payment, McGuire still retained access to 28 some of his land. The analysis ends there because the *Tahoe-Sierra* standard looks at

depravation of use, not profit. As a result, the bankruptcy court correctly concluded that the *Penn Central* factors applied rather than finding a total regulatory taking.

### B. Conclusion of Law No. I.B.3. Arbitrary Taking

The bankruptcy court identified an additional type of taking as an "arbitrary taking." This taking, the court wrote, occurs where a government's regulatory action is arbitrary and unreasonable compared to the loss sustained by the property owner. The court cited *Goldblatt v. Town of Helpstead*, 369 U.S. 590 (1962) for support. There, the Supreme Court upheld a city ordinance regulating mining activity. *Id.* at 591. The Court stated a rule that, where there was not a complete regulatory taking of property, a regulation reducing the value or use of land is not an unconstitutional taking if it is "a valid exercise of the town's police power." *Id.* at 594. An ordinance is valid if it serves the public interest, the means employed are "reasonably necessary" to meet the interest, and the means are not "unduly oppressive upon individuals." *Id.* at 594–95.

The *Goldblatt* rule from 1962 is inconsistent with modern rule articulated in *Penn Central* in 1978 and most recently affirmed in *Lingle* in 2005. Where a regulatory action only results in a partial taking, the Supreme Court held a takings claim is "governed by the standards set forth in [*Penn Central*]." *Lingle*, --- U.S. at ---, 125 S. Ct. at 2081. This modern takings doctrine does not question the validity of the government's regulatory power or how it is exercised. The power is uncontested. Rather, the doctrine focuses on the Constitutional condition to wielding that power: government must compensate where the regulation amounts to a taking. *Id.* at ---, 125 S. Ct. at 2080. As a result, a reviewing court does not look at whether the means employed were arbitrary or unreasonable but instead ensures the government compensates the property-owner where a taking has occurred.

There is no "arbitrary taking" doctrine under which McGuire can raise a claim because the modern takings doctrine focuses on the sufficiency of compensation rather than the means used to take the property. Thus, this Court rejects the bankruptcy court's conclusion of law on this point. Nor will this Court address McGuire's objection to the conclusion of law.

**C. Conclusion of Law No. I.A.2. Access**

Access between a public road and the abutting property is an incident of ownership. *Johnson v. United States*, 479 F.2d 1338, 1390–91 (Ct. Cl. 1973); *State ex rel. Herman v. Cardon*, 544 P.2d 657, 660 (Ariz. 1976); *State ex rel. Herman v. Wilson*, 438 P.2d 760, 762 (Ariz. 1968); *State ex rel. Morrison v. Thelberg*, 350 P.2d 988, 991 (Ariz. 1960). Loss of the right of access is compensable. *Thelberg*, 350 P.2d at 992; *see also Winn v. United States*, 272 F.2d 282 (9th Cir. 1959).

The bankruptcy court concluded that because the bridge was the means of access from the Northern Portion to Mohave Road, McGuire had lost a part of his leasehold interest when the bridge was destroyed. The Government disagreed. It argued that destroying the bridge did not deprive McGuire of incident-of-ownership access because the Northern Portion does not abut the public road; it abuts the canal, which is a nonpublic right-of-way. In response, McGuire asserted his land does abut the public road because his lease included the land between the highway and the canal, the easement runs over the leased property, and the bridge was a "present existing road" secured by the lease.

The bankruptcy court erred in its conclusion of law regarding access. The rule is not that "[a]ccess to property from a public road is an incident of ownership," Doc. No. 1, Attach. No. 1 at 12, but rather that access to *abutting* property from a public road is an incident of ownership. *Cardon*, 544 P.2d at 660 ("'Access may be defined as the right vested in the owner of land which adjoins a road or other highway to go and return from his own land to the road or highway without obstruction.'") (quoting *Stoner Mfg. Corp. v. Young Men's Christian Ass'n of Aurora*, 148 N.E.2d 441 (Ill. 1958)). "Abutting" is defined as "[p]rojecting towards; terminating upon or against; coming into contact, touching." Oxford English Dictionary (2d. 1989).

Undoubtedly, McGuire has a right in ingress and egress from the Southern Portion to Mohave Road. His leased property touches the public road. Similarly, McGuire has a right

of access to Mohave Road from the sliver of land between the road and the canal. The more difficult issue is whether the existence of a non-public right-of-way, the canal, between the Northern Portion and Mohave Road severs the property and the road such that the two cannot be described as "abutting."

The Government offered a colorable objection to the bankruptcy court's conclusion. Specifically, the Government noted that the surface of the Northern Portion does not touch Mohave Road; therefore, the Government argued, the Northern Portion does not abut Mohave Road. All of the cases relied upon by the bankruptcy court concern property touching a public road or highway.

Having considered the bankruptcy court's conclusion, and reviewing the history of the canals *de novo* because of the Government's objection, the Court concludes that the property does abut Mohave Road. The United States constructed the canal pursuant to its authority under 43 U.S.C. § 945 (2005) to create "right[s] of way thereon for ditches or canals." The purpose of the statute is to permit the government to improve arid lands though canal systems. *United States v. Van Horn*, 197 F. 611, 615 (D.C. Colo. 1912). The statute only allows reservation of an easement or surface right, but does not extend to other rights in the land. *N. Pac. Ry. Co. v. United States*, 277 F.2d 615, 618 (10th Cir. 1960) (limiting the reservation of land to a surface right and excluding title to subsurface oil and gas). The reservation is an "inseparable incident and burden of ownership of such land." *Dopps v. Alderman*, 121 P.2d 388, 391 (Wash. 1942) (holding in part that the existence of a right-of-way for a canal did not amount to a breach of a covenant against encumbrances). Because mere reservation of the surface rights of land for a canal does not sever other rights in the land, the other rights in the land remain continuous. Thus, the canal does not stop the Northern Portion from abutting Mohave Road.

As a result, removal of the bridge severed McGuire's right of access. Specifically, the Colorado River Indian Tribe ("CRIT") still had title to the land underlying the canal. CRIT

1 conveyed the entire property subject to the reservation of the surface rights of the canal to
2 McGuire including the right of access to Mohave Road from the Northern Portion. Removal
3 of the bridge interfered with his right because the bridge was the only means of access to the
4 Northern Portion from Mohave Road to fulfill the farming purpose of his lease.

### D. Conclusion of Law No. I.A.3. Bridge

Ownership of property can occur in a number of ways: by purchase, through descent, by transfer or conveyance, by accretion (real property), by the increase of animals (personal property), and by its incorporation into or union with other property. 63C Am. Jur. 2d *Property* § 24 (2005). Ownership of the bridge in this case is disputed.

The bankruptcy judge first held that ownership of the bridge was not important because, regardless of the owner, McGuire was entitled to just compensation under a theory of loss of access or regulatory taking. In an alternative holding, however, the bankruptcy judge concluded that CRIT owned the bridge because the bridge was built on CRIT land and did not interfere with the purpose of the canal.

The Government argued this holding lacked factual support. While all parties seemed to believe the bridge was built in the 1960s, no evidence of the history of ownership nor a claim by CRIT of current ownership was presented at trial. In response, McGuire made two arguments. First, he argued that since neither he[3] nor the Government claimed ownership of the bridge, CRIT must own the bridge. Second, he argued that a previous tenant erected the

---

[3] The Government pointed to McGuire's assumption of ownership in his Notice of Appeal dated August 18, 2000. However, McGuire's assumption is based on direction from a BIA official that the bridge was McGuire's and "does not belong to the Tribe or to BIA." Ex. 28. McGuire went on to illustrate the confusion regarding ownership of the bridge including Anspach's application of law that applies only if the bridge was McGuire's and other law that only applies if the bridge was federally-owned. Indeed, one of Anspach's subordinates wrote that the ownership of the bridge needed to be determined. Ex. 28 and Ex. 34.

bridge and then abandoned it so CRIT took possession by incorporation of the improvement or fixture.[4]

The record is insufficient to support a definitive conclusion of ownership. McGuire presented a plausible theory of ownership in his fixture argument. CRIT appears to have possessed the bridge for over two dozen years, which is a reasonable time for incorporating the bridge into the property. Yet possession of personal property, while *prima facie* evidence of title, can be trumped by actual title. 63C Am. Jur. 2d *Property* § 28 (2005). Actual title has not been shown nor does it appear from the record the parties attempted to determine title. However, this Court agrees with the bankruptcy court that McGuire would be entitled to just compensation under a theory of loss of access from a regulatory taking regardless of ownership of the bridge.

**E. Conclusion of Law No. I.C.1. Permit Defense**

The Court has analyzed, based on the bankruptcy court's proposed findings of fact and conclusions of law, whether the Government's actions in this case could qualify as a taking; however, before reaching the issue of damages, the Court must consider certain defenses available to the Government. For example, a permit application process is a defense to a regulatory taking. Specifically, a regulatory action does not effect a taking if an available permit process leaves the door open to the landowner to use the property as desired. *Tabb Lakes, LTD v. United States*, 10 F.3d 796, 800–01 (Fed. Cir. 1993). Thus, "'[o]nly when a permit is denied and the effect of the denial is to prevent 'economically viable' use of the land in question can it be said that a taking has occurred.'" *Id.* at 801 (quoting *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 126–27 (1985)); s*ee also Adams v. United States*, 255 F.3d 787, 794–95 (9th Cir. 2001).

---

[4] See 41 Am. Jur. 2d *Improvements* § 1 (2005) and 35 Am. Jur. 2d *Fixtures* § 2 (2005) for an explanation of the difference between a fixture and an improvement. The bridge most likely qualifies as a fixture because it has been connected to the underlying land for over twenty years. 35A Am. Jur. 2d. *Fixtures* § 3 (2005) ("[A] 'fixture' is an article of personal property which has been so annexed to realty that it is regarded as a part and parcel of the land.")

- 9 -

There is a futility exception to the rule requiring a property owner to use the available permit process before claiming a taking where a party has already filed an initial meaningful application. The exception provides that a takings claim is ripe where it would be idle or futile for a property owner to resubmit an application. *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1232 (9th Cir. 1994) (citing *Del Monte Dunes, Ltd. v. Monterey*, 920 F.2d 1496, 1501 (9th Cir.1990)). In *Kawaoka*, the court held the land developers' regulatory taking claim against the city unripe for review because the developers had never filed specific, formal development plans. *Id.* at 1325;[5] *see also Wyatt v. United States*, 271 F.3d 1090, 1097 (Fed. Cir. 2001) (finding no valid property interest for a takings claim where the plaintiff voluntarily relinquished her leasehold interest based on the belief that pursuing the permit process would have been futile).

Federal regulation provides two types of permits for structures crossing "project" canals.[6] First, a private party can apply for a permit relieving the government from liability or responsibility for a bridge built by and for the project. 25 C.F.R. § 171.9(d) (2005). Second, a private party can apply for a permit to build a crossing over a project canal for private use and at its own expense. 25 C.F.R. § 171.9(c) (2005).

The bankruptcy court found that while a permit process may have existed in theory, it was not reasonably available to McGuire in fact. The Government countered that the process was open but McGuire failed to respond because he only formally expressed interest in repairing not replacing the bridge. McGuire responded by highlighting the factual support for his frustrated efforts to both preserve the existing bridge and build a new bridge. He concluded that the government "unreasonably denied him" a permit.

---

[5] The developers counter argued that because the city had no policy articulating how it would adopt a specific plan and they were told they could not apply, applying was futile. The court found, however, that prior to the district court entering its order, the city had adopted application procedures so the futility exception did not apply. *Kawaoka*, 17 F.3d at 1232.

[6] "Project" refers to the government's efforts under 43 U.S.C. § 945 to improve arid lands by creating irrigation systems.

- 10 -

Prior to deciding whether McGuire was denied a permit, the Court must first determine what permit process was available to him. The process provided to a private party wishing to relieve the government from liability or responsibility for a bridge built by and for the project was unavailable to McGuire because the BIA did not build the bridge for its use. The bankruptcy court found that "the Bridge was constructed by a former tenant sometime in the 1960's[.]" Doc. No. 1, Attach. No. 1 at 4. Neither party objected to this FOF. Thus, the only permit process available to McGuire was the one described in 25 C.F.R. § 171.9(c) for private parties wishing to build a crossing over a project canal for private use.

McGuire never availed himself of this permit process so his claim is unripe. In three formal three letters to McGuire sent throughout 1999, Anspach specified that McGuire needed to submit a plan for a new bridge and apply for a crossing permit. McGuire testified that at one point in 1999 he drew a sketch of a possible bridge design in the presence of a BIA employee and the employee promised to discuss the drawing with Anspach. At trial, the employee denied ever seeing a sketch. Even if this qualified as an "application," BIA never denied McGuire a permit to build a new bridge. A written denial is not present in the record nor did McGuire testify that the government ever orally denied his application for a new bridge. From this sparse and disputed record, the Court cannot conclude that McGuire submitted a "plan" as contemplated under 25 C.F.R. § 171.9(c) and Anspach "rejected" the plan solely by his failure to return phone calls. Had McGuire applied for and received the permit, he would have been able to build a bridge and continue to use his property as he desired: farming the Northern Portion. Because the government never denied an application from McGuire for a permit to construct a new bridge, the Northern Portion was not taken and his takings claim is not ripe for review.[7]

Because his takings claim is unripe, this Court cannot grant him any monetary or injunctive relief on his claim. Accordingly, the bankruptcy court's recommended award of

---

[7] The fact that the permit process was nebulous does not amount to a denial of a permit. Mistakes in a permit process may give rise to a due process claim but not to a takings claim. *Tabb Lakes, LTD*, 10 F.3d at 803.

- 11 -

1 damages to McGuire will be rejected based on the permit defense asserted by the
2 Government.

### F. Conclusion of Law No. I.D Intent and Causation

For a property loss to be compensable as a taking, there must be: (1) proof of substantial harm to the owner; and, (2) either government intent to invade or harm that is the direct, natural, or probable consequence of authorized government action and not merely incidental to it. *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355–56 (Fed. Cir. 2003); *accord Esplanade Properties, LLC v. City of Seattle*, 307 F.3d 978, 984 (9th Cir. 2002) (under federal law, a plaintiff in a takings claim must show causation between the government action and the alleged taking).

The bankruptcy court found both the requisite intent and causation because BIA evidenced its intent to remove the bridge in its numerous written and oral communications and, in fact, removed the bridge, which resulted in McGuire's inability to access and farm the Northern Portion. The Government argued McGuire's failure to submit a meaningful application that was denied caused the loss of his leasehold.[8] McGuire reiterated support for the bankruptcy court's conclusion.

Because the Court concludes above that McGuire never filed a formal application that the government rejected, removal of the bridge cannot be said to have caused an unconstitutional taking of his property. The BIA's regulatory action did not effect a taking since a permit process existed for McGuire to build a bridge and continue to use the property as he desired. McGuire had opportunity to submit an application but did not. Loss of access to the Northern Portion of his leasehold, then, was incidental to the removal of the bridge.

### G. Conclusion of Law No. I.E Damages

---

[8] In support of its argument, the Government referenced the following evidence from the record: McGuire financial ability to have made the Jan. 1, 2000 lease payment and thereby avoid losing his leasehold, McGuire's procedural ability to have submitted an application between removal of the bridge and cancellation of his lease, and the low cost of a replacement bridge.

"Just compensation" under the Fifth Amendment is traditionally measured as the fair market value of the property taken. *United States v. Petty Motor Co.,* 327 U.S. 372, 377–78 (1946). In other words, a property owner should be placed in as good a position as if the property had not been taken. *Wash. Legal Found. v. Legal Found. of Wash.,* 271 F.3d 835, 862 (9th Cir. 2001) (citing *United States v. 564.54 Acres of Land*, 441 U.S. 506, 510 (1979)). Fair market value is determined by "'what a willing buyer would pay in cash to a willing seller' at the time of the taking." *Kraft, Inc. v. United States.*, 30 Fed. Cl. 739, 760 (Fed. Cl. 1994) (quoting *United States v. Miller*, 317 U.S. 369, 374 (1943)).[9] However, damages are not limited to the value of the part appropriated, but also can include depreciation of the remaining property. *United States v. Pope & Talbot, Inc.*, 293 F.2d 822, 824 (9th Cir. 1961).

Computing damages for loss of a right of access differs from the calculation for physical takings. An owner who losses a right of access through condemnation is entitled to compensation to the extent of the decrease in the value of the land served by the easement. *United States v. 57.09 Acres of Land, More or Less, Situate in Skamania County, State of Wash.*, 706 F.2d 280, 281 (9th Cir. 1983).

Finally, incidental losses resulting from a taking are not compensable. *Wash. Legal Found.,* 271 F.3d at 862 (citing *Winn*, 272 F.2d at 286 (9th Cir.1959)). In *Winn*, landowners sought damages above the fair market value of the small portion of land annexed for an interstate highway based on loss of business. 272 F.2d at 283–85. The new interstate would divert people away from the smaller highway upon which their souvenir business perched. *Id.* The court declined the landowners' request for severance damages because the business portion of the land did not share a "unitary or integrated use" with the small grazing portion taken. *Id.* at 286. The court also rejected a request for damages for loss of access not because

---

[9] The Court of Federal Claims has recognized circumstances where measures other than fair market value may be more appropriate such as when finding the market value is too difficult or when application of the fair market value measure "'would result in manifest injustice to owner or public.'" *Kraft*, 30 Fed. Cl. at 761 (quoting *United States v. Commodities Trading Corp.*, 339 U.S. 121, 123 (1950)). The primary consideration is justice. *Id.*

- 13 -

1  such a loss is not compensable but rather because the landowners had not lost their rights of
2  access. *Id.* at 287.

3  In this case, the bankruptcy court held McGuire was only entitled to damages
4  reflecting the fair market value of the lost property but not for speculated business losses.
5  Thus, the bankruptcy court concluded that the appropriate damages amounted to the fair
6  market value of the entire leasehold interest, which includes both the Northern Portion and
7  the Southern Portion. The bankruptcy court calculated this amount as $226,411.92 for each
8  year left on the lease, which, for five years, amounted to $1,132,059.60. McGuire objected
9  and argued that he was entitled to recover not the fair market value of the leasehold but rather
10 the lost profits from the crop on the Northern Portion. The Government asserted that based
11 on its legal arguments, the bankruptcy court's damages conclusion is unsupportable.
12 Because this Court concludes that McGuire's takings claim is not ripe for review, the Court
13 need not review the calculation of damages as no damages will be awarded.

14 **IV. CONCLUSION**

15 The Court accepts the bankruptcy court's findings of fact subject to the Court's
16 amendment of FOF 12. The Court accepts the bankruptcy court's conclusion that removal
17 of the bridge severed McGuire's right of access to Mohave Road, rejects the bankruptcy
18 court's conclusion that ownership of the bridge could be determined, rejects the bankruptcy
19 court's conclusions that an "arbitrary takings" rule exists, and finds that a partial regulatory
20 taking was possible because the property abuts a public road. Nonetheless, the Court
21 concludes that the permit process defense causes any consideration of damages to be unripe
22 for review at this time because the Government did not receive and reject an application from
23 McGuire to build a bridge so he still had an avenue open to continue to farm the property.
24 Thus, based on the foregoing,

25 IT IS ORDERED that the bankruptcy court's proposed findings of fact, issues of law,
26 and conclusions of law (Doc. No. 1, Attach. No. 1) are hereby accepted or rejected as
27 indicated above, and the objections of McGuire (Doc. No. 1, Attach. No. 2) and the
28 Government (Doc. No. 1, Attach. No. 3) are sustained or overruled as indicated above;

1   IT IS FURTHER ORDERED that the bankruptcy court's recommendation that this
2   Court award damages to McGuire in the amount of $1,132,059.60 is rejected; and for the
3   reasons stated above, this Court finds in favor of the Government, Plaintiff shall take nothing,
4   and the Clerk of the Court shall enter judgment accordingly;

5   IT IS FURTHER ORDERED that this Order shall serve as the mandate in this case.
6   DATED this 4th day of April, 2006.

_____
James A. Teilborg
United States District Judge